IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

CYNTHIA SKANES, o/b/o,      *
JESSICA F. SKANES,          *
                            *
    Plaintiff,              *
                            *
vs.                         *      Civil Action No. 03-00884-P-B
                            *
JO ANNE B. BARNHART,        *
Commissioner of            *
Social Security,            *
                            *
    Defendant.              *

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C.§ 1383 (c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying her claim for supplemental security income benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  The parties waived oral argument.  Upon careful consideration of the administrative record and the parties' argument as raised in their memoranda, the undersigned respectfully recommends that the decision of the Commissioner be **affirmed.**

## I.   Procedural History

Plaintiff's mother, Cynthia Skanes, protectively filed, on behalf of her daughter, Plaintiff Jessica Skanes, an application for supplemental security income benefits on June 12, 2000,

alleging that Plaintiff has been disabled since June 1, 1997 due to a tumor in her left hip and scoliosis of the spine. (Tr. 56-57, 58, 62-65, 85, 95, 110-111). Plaintiff's application was initially denied on December 27, 200, and a Request for Hearing was filed on February 21, 2001. (Tr. 39-41, 42-43).[1] Administrative Law Judge (ALJ) Irwin W, Coleman, Jr. conducted a hearing on September 26, 2001, which was attended by Plaintiff, Plaintiff's mother, Cynthia Skanes, and Plaintiff's attorney. (Tr. 199-210). On February 6, 2002, ALJ Coleman entered an unfavorable decision wherein he found that Plaintiff has the severe impairments of a femoral neck fibrous dysplasia on the left side and a six degree levoscoliosis, and that her impairments, when considered individually, or in combination, do not meet or medically equal a Listing, or result in a functionally equivalent level of severity of a listed impairment. (Tr. 9-19). On October 31, 2003, Plaintiff's request for review was denied by the Appeals Council, thus making the ALJ's decision the final decision of the Commissioner of Social Security. (Tr. 4-6). The parties agree that this case is now ripe for review and is properly before this Court pursuant to 42 U.S.C. § 1383 (c)(3).

---

[1]   The reconsideration stage was eliminated from this case pursuant to testing modifications to the disability determination procedures. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

II.  **Background Facts**

Plaintiff, Jessica F, Skanes, was born on December 7, 1988, and was twelve years old at the time of the administrative hearing on September 26, 2001. (Tr. 202).  Plaintiff lives with her mother, Cynthia Skanes, and was entering the seventh grade at the time of the administrative hearing.  (Tr. 203). According to Plaintiff's mother, Plaintiff has problems with her left hip, and underwent hip surgery three years earlier because a tumor had deteriorated the bone that joins her hip together. Id.  Plaintiff's mother testified that Plaintiff was in a body cast for two or three months after the surgery, and missed a school term.  Plaintiff's mother further testified that Plaintiff's doctor has advised Plaintiff will need to undergo another surgery, but he is delaying surgery as long as Plaintiff can tolerate the pain.  Id.  Plaintiff's mother testified that she sought a second opinion from another doctor who agreed that Plaintiff needs another surgery.  (Tr. 203-204, 207-208).

According to Plaintiff's mother, as a result of her condition, Plaintiff has to be very careful, avoid any kind of activity, and use her crutches when she starts limping really bad or when her hip starts to hurt.  (Tr. 203, 206-207). Plaintiff's mother further testified that Plaintiff can only take Tylenol for her pain because she has to avoid medication

3

that may upset her bone.  She also testified that she does not allow Plaintiff to ride the bus to school when she starts limping a lot, and that when Plaintiff is in pain, she sometimes cuts the hair off her dolls' heads.  (Tr. 207).  She further testified that at one time Plaintiff was irritated because she could not participate in any school activities; however, she is adjusting better, and Plaintiff's school has really worked with her by allowing Plaintiff extra time to get to class.  (Tr. 204, 207).

Plaintiff testified that her hip causes her a lot of pain, and that the pain is exacerbated by cold weather.[2]  (Tr. 205).  Plaintiff further testified that she has to use crutches once a week because of the pain.  According to Plaintiff, before her surgery, she was a cheerleader, played with her classmates during physical education class and played in her neighborhood.  Plaintiff testified that she misses being able to participate in activities and that her inability to participate has caused problems with her friends.  (Tr. 205-206).

The ALJ determined that Plaintiff has not engaged in

_____

[2]  Plaintiff's mother testified that when Plaintiff was in fifth grade, the cold weather caused Plaintiff's hip to hurt so bad that she was unable to go to school the last two or three weeks, and the pain caused her back to start hurting.  (Tr. 208).  She further testified that Plaintiff is unable to stretch her leg when it is cold, and stays in bed most of the time.  (208-209).

substantial gainful activity since her alleged onset of disability. (Tr. 13, 18). The ALJ further determined that Plaintiff has the severe impairments of a femoral neck fibrous dysplasia on the left side and a six degree levoscoliosis. Id. Next, the ALJ concluded that Plaintiff does not have an impairment or combination of impairments which meet or medically equal the criteria for any of the impairments listed in 20 C.F.R. Pt. 404, App. 1., Subpt. P. (Tr. 13-14, 19). The ALJ also found Plaintiff's subjective complaints of pain and allegations of disability, as well as the testimony of Plaintiff's mother regarding the severity of Plaintiff's condition, are not fully credible nor supported by objective medical evidence. (Tr. 18-19). The ALJ then determined that Plaintiff's impairments, when considered individually or in combination, are not functionally equivalent to a listed impairment, and Plaintiff is not disabled. Id.

III. **Issues on Appeal**

1. Whether the ALJ erred in finding that Plaintiff's impairments do not meet or medically equal a Listing, or result in severity that is functionally equivalent to a Listing?

2. Whether the ALJ erred in finding that Plaintiff had marked limitations in only one domain of functioning?

3. Whether the ALJ erred by finding Plaintiff's subjective

complaints and the testimony of Plaintiff's mother were not credible without providing any viable reasoning or explanation.

IV. **Analysis**

    A. **Standard of Review**

In reviewing claims brought under the Act, this court's role is a limited one. The court's review is limited to determining: 1) whether the decision of the Secretary is supported by substantial evidence, and 2) whether the correct legal standards were applied. <u>Martin v. Sullivan</u>, 894 F.2d 1520, 1529 (11th Cir. 1990).[3] A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. <u>Sewell v. Bowen</u>, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. <u>Brown v. Sullivan</u>, 921 F.2d 1233, 1235 (11th Cir. 1991); <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983)(Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, the court must view the record as a whole, taking into account evidence favorable as

---

[3] This court's review of the Commissioner's application of legal principles is plenary. <u>Walker v. Bowen</u>, 826 F.2d 996, 999 (11th Cir. 1987).

6

well as unfavorable to the Commissioner's decision.  Chester v.
Bowen, 792 F.2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999
U.S. Dist. Lexis 10163 (S.D. Ala.).

**B.   Discussion**

The definition of "disabled" for children under 18 is:

> An individual under the age of 18 shall be
> considered disabled for the purposes of this
> subchapter if that individual has a
> medically determinable physical or mental
> impairment, which results in marked and
> severe functional limitations, and which can
> be expected to result in death or which has
> lasted or can be expected to last for a
> continuous period of not less than 12
> months.

42 U.S.C. § 1382c(a)(3)(C)(i)(2004); see also 20 C.F.R. §
416.906 (2005).  The Social Security regulations provide a
three-step sequential evaluation process for determining
childhood disability claims.  See 20 C.F.R. § 416.924(a)(2005).[4]

---

[4] First, a determination must be made as to whether the claimant is
engaging in substantial gainful activity.  If so, a determination will be made
that the claimant is not disabled and the claim will not be reviewed further.
If it is determined that the claimant is not engaging in substantial gainful
activity, next the claimant's physical or mental impairment(s) will be
considered first to see if the claimant has an impairment or combination of
impairments that is severe. If the claimant's impairment(s) is not severe, a
determination will be made that the claimant is not disabled and the claim
will not be reviewed further. Finally, if the claimant's impairment(s) is
severe, the claim will be reviewed further to determine if the claimant has an
impairment(s) that meets, medically equals, or functionally equals the
listings. If the claimant has such an impairment(s), and it meets the duration
requirement, the claimant will be found disabled. If the claimant does not
have such an impairment(s), or if it does not meet the duration requirement,
the claimant will be found not disabled.  20 C.F.R. § 416.924(a)(2005); see
also Shinn v. Comm'r of Soc. Sec., 391 F.3d 1276, 1278-1279 (11th Cir. 2004).

At step one, a plaintiff's age and work activity, if any, are identified. At step two, the severity of the impairments is identified. Under the regulations a severe impairment is one that is more than "a slight abnormality or a combination of slight abnormalities that causes no more than minimal functional limitations." 20 C.F.R. § 416.924(c)(2005). If it is determined that a plaintiff has a severe impairment, the plaintiff must then establish that the impairment results in marked and severe functional limitations. 42 U.S.C. § 1382c(a)(3)(C)(i)(2004). The regulations set forth that an "impairment(s) causes marked and severe functional limitations if it meets or medically equals the severity of a set of criteria for an impairment in the listings, or if it functionally equals the listings." 20 C.F.R. § 416.924(d) (2005).

If the functional limitations caused by a plaintiff's impairment do not meet or medically equal any listing, then the Commissioner must determine whether the impairment or combination of impairments results in limitations which functionally equal the criteria for a listing. 20 C.F.R. §416.926a(a)(2005) ("If you have a severe impairment or combination of impairments that does not meet or medically equal any listing, we will decide whether it results in limitations that functionally equal the listings. By 'functionally equal

8

the listings,' we mean that your impairment(s) must be of listing-level severity; i.e., it must result in 'marked' limitations in two domains of functioning or an 'extreme' limitation in one domain, as explained in this section.").

To make this determination, the Commissioner must address six domains of development or functioning: (i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and, (vi) Health and physical well-being. 20 C.F.R. § 416.926a(b)(1)(i-vi)(2005). If a plaintiff has an extreme limitation in one domain or marked limitation in two domains, a finding of functional equivalence will be made. 20 C.F.R. § 416.926a(d),(e),(f) (2005).[5]

An extreme limitation of function occurs when the impairment "interferes very seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(3)(i)(2005). This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities, and is given to the "worst limitations." Id. Also, the regulations state that an extreme limitation is "the equivalent of the

---

[5] The regulation sets forth the methods for using each domain to evaluate functional equivalence to a listing. 20 C.F.R. § 416.926a(f)(2005).

functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean." Id. [6]

A marked limitation of function occurs when the impairment "interferes seriously with [plaintiff's] ability to independently initiate, sustain or complete activities". 20 C.F.R. § 416.926(e)(2)(i)(2005). This limitation may occur whether the impairment limits one activity or the cumulative effect of plaintiff's impairments limit several activities. Id. Also, the regulations state that a marked limitation is "the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean." Id. [7]

In the case *sub judice*, the ALJ applied the above standards for evaluating child supplemental security income disability claims, and found that Plaintiff has not engaged in substantial

---

[6] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(3)(i)-(iv)(2005). Additionally, 20 C.F.R. § 416.926(e)(4) explains the method for consideration of standardized test scores.

[7] The regulations further discuss this standard in terms of functioning according to chronological age, the use of standardized test scores to measure functioning in a domain, and for the sixth domain of functioning, health and physical well-being, the frequency of exacerbation of the impairment. 20 C.F.R. § 416.926(e)(2)(i)-(iv)(2005). Additionally, 20 C.F.R. § 416.926(e)(4) explains the method for consideration of standardized test scores.

gainful activity since her alleged onset of disability, and that she suffers from the severe impairments of a femoral neck fibrous dysplasia on the left side and a six degree levoscoliosis. (Tr. 13, 18). Then, as noted *supra*, proceeding to the next step, the ALJ found that these impairments, when considered individually, or in combination, do not meet or medically equal a criteria listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1. (Tr. 13-14, 19). The ALJ further determined that Plaintiff's impairments, when considered individually or in combination, are not functionally equivalent to a listed impairment, and Plaintiff is not disabled. (Tr. 18-19).

Plaintiff argues, without discussion or elaboration, that the ALJ erred in finding that her impairments do not meet or medically equal a listed impairment. Plaintiff also attacks the ALJ's finding that her impairments are not functionally equivalent to a Listing. Specifically, Plaintiff argues that the ALJ failed to take into account all the facts as they relate to factors considered in determining whether Plaintiff's impairments are functional equivalent to a Listing.[8] In

---

[8] In assessing a child's functional limitations, relevant factors outlined in 20 C.F.R. §§ 416.924a, 416.924b and 416.929 are considered. See 20 C.F.R. 416.926a(a). The factors include, and the ALJ considered: (1) how the Plaintiff's functioning compares to the functioning of children the same age who do not have impairments; (2) the combined effects of Plaintiff's multiple impairments; (3) how well Plaintiff can sustain and complete activities, including the amount of help or adaption she needs, and the

considering the relevant factors, Plaintiff argues that the ALJ should have found she has extreme limitations in the domain of moving about and manipulating objects since Plaintiff has such difficulty walking.   Plaintiff further argues, assuming *arguendo*, that the ALJ was correct in finding that Plaintiff has only marked limitations in the functional domain of moving and manipulating objects, the ALJ should have also found marked limitations in the functional domains of interacting and relating with others, or health and physical well-being.

In support of her contentions, Plaintiff notes that she is no longer able to participate in school events, physical education class, cheerleading, or any other type similar activity, and that this has had an extreme effect on her social activities, her interaction with others, and her overall well-being.   Plaintiff further contends that her mother's testimony, the questionnaires completed by her school, and the medical records provide further support and corroboration regarding the severity of her impairments and pain.

In determining that Plaintiff's impairments, when considered

_____

effects of structured or supportive settings; (4) functioning in unfamiliar settings, such as a one-on-one examination conducted by a consulting psychologist or physician; (5) early intervention and school programs; the impact of illness and limitations that interfere with Plaintiff's activities over time; and the effects of treatment (including medications and other treatment).

individually or in combination, do not meet or medically equal
a Listing, the ALJ considered listed impairments related to the
musculoskeletal system at listing 101.02 through 101.08, and
specifically found that Plaintiff's impairments do not meet or
medically equal the requirements of § 101.03.[9]   Then, in

---

[9]  Listing § 101.03 requires:

> Reconstructive surgery or surgical arthrodesis of a major weight-
> bearing joint, with inability to ambulate effectively, as defined
> in 101.00B2b, and return to effective ambulation did not occur, or
> is not expected to occur, within 12 months of onset.

§ 101.00B2b provides as follows:

> (1) Definition.  Inability to ambulate effectively means an
> extreme limitation of the ability to walk; i.e., an impairment
> that interferes very seriously with the child's ability to
> independently initiate, sustain, or complete activities.
> Ineffective ambulation is defined generally as having insufficient
> lower extremity function (see 101.00J) to permit independent
> ambulation without the use of a hand-held assistive device(s) that
> limits the functioning of both upper extremities.  . . .
>
> . . .
>
> (3) How we assess inability to ambulate effectively for older
> children.  Older children, who would be expected to be able to
> walk when compared to other children the same age who do not have
> impairments, must be capable of sustaining a reasonable walking
> pace over a sufficient distance to be able to carry out age-
> appropriate activities.  They must have the ability to travel age-
> appropriately without extraordinary assistance to and from school
> or a place of employment.  Therefore, examples of ineffective
> ambulation for older children include, but are not limited to, the
> inability to walk without the use of a walker, two crutches or two
> canes, the inability to walk a block at a reasonable pace on rough
> or uneven surfaces, the inability to use standard public
> transportation, the inability to carry out age-appropriate school
> activities independently, and the inability to climb a few steps
> at a reasonable pace with the use of a single hand rail.  The
> ability to walk independently about the child's home or a short
> distance at school without the use of assistive devices does not,
> in and of itself, constitute effective ambulation.

13

determining that Plaintiff's impairments are not functionally equivalent to a listed impairment, the ALJ found that Plaintiff has no functional limitations in the domains of acquiring and using information, attending to and completing tasks, interacting and relating with others, and health and physical well-being.  The ALJ further determined that, considering the combined effects of Plaintiff's impairments, Plaintiff has marked limitations in the domain of moving about and manipulating objects.  (Tr. 15-16).  As the ALJ found marked limitations in only one domain of functioning, he determined that Plaintiff's impairments are not functionally equivalent to a listed impairment, and therefore, Plaintiff is not disabled.

In making his determination, the ALJ considered, and relied upon, records submitted by Plaintiff's school.  (Tr. 16-17, 112-126).  One of Plaintiff's teachers described Plaintiff as being a typical student and reported that Plaintiff's functioning compares favorably with the functioning of other children her age and that absenteeism was not a problem.  (Tr. 18, 112-114).  The report further indicated that Plaintiff: functions academically with average ability and performs as most other normal children; works well independently and responds appropriately to teachers; has no problems with social skills; has no problems with any age-appropriate self-help skills; is

14

unable to participate in physical education as a result of her limp; does not require any special devices to accommodate her physical needs; and has not exhibited any sudden worsening in functioning or behavior. (Tr. 17, 112-114).

The ALJ determined that Plaintiff's subjective complaints of pain and allegations of disability, as well as the testimony of Plaintiff's mother regarding the severity of Plaintiff's condition, are not fully credible nor supported by objective medical evidence. (Tr. 18-19). The ALJ found that the record established that frequent visits to a physician or health care provider are not required. (Tr. 16). To that end, the ALJ observed that Plaintiff underwent surgery on August 12, 1997, for an incisional biopsy with fibular allograft because of a lytic lesion of the left femoral neck, which Plaintiff tolerated well and resulted in Plaintiff being in a Spica cast for four weeks. (Tr. 16, 130-138, 184, 185). Follow-up examinations in September and October of 1997 indicate that Plaintiff was doing well and her wound was healing appropriately. (Tr. 183-184). The ALJ determined that the medical records substantiate that Plaintiff made a slow, but good recovery following surgery, and that upon examination on numerous subsequent occasions, treatment notes indicate that Plaintiff was doing well and experienced only occasional pain. (Tr. 16, 144-167, 170-187,

15

195-198).

Specifically, the ALJ observed that Plaintiff's treating physician, Dr. Prasit Nimityongskul, M.D., opined that Plaintiff was doing well when examined on January 8, 1998, and indicated that "[e]verything seem[ed] to be growing well, and the graft seem[ed] to be giving support.  It seem[ed] like the superior cortex of the femoral neck [was] also thickening." (Tr. 182). Plaintiff only complained of occasional aches and pain, and her physical examination revealed that her wounds were healed and dry; she had good range of motion; no instability; and she was neurologically intact.  <u>Id.</u>  In fact, Dr. Nimityongskul's treatment notes for March 5, 1998 reflect that Plaintiff's "mom and dad say she is really not limiting her activities.  She is riding a bike, running around, and is being pretty active." (Tr. 181).  Dr. Nimityongskul's physical examination of Plaintiff revealed that she had full range of motion; all her wounds were healed; she had no signs of trauma or swelling; she was neurologically in tact; and x-rays of her hip showed no expansion of the lesion, maybe some subtle decrease in size. <u>Id.</u>

Plaintiff was described as doing "quite well" upon examination by Dr. Nimityongskul on June 9, 1998, and her examination revealed that her wound was well healed, she had

good range of motion, and x-rays of Plaintiff's hip, pelvis and lateral showed good incorporation of the graft. (Tr. 180). Dr. Nimityongskul again opined, based on an October 1998 examination, that Plaintiff was improving and healing; although, she reported having occasional pain with limping. (Tr. 179).

Plaintiff's examination on February 4, 1999 revealed that the allograft was amalgamating with the bone, the lesion appeared to be healing satisfactorily, Plaintiff had no symptoms at that point and was advised to refrain from any contact sports. (Tr. 178). Upon examination on August 31, 1999, Dr. Nimityongskul's treatment records indicate that Plaintiff was slowly healing, and x-rays revealed progressive consolidation of the graft area. Although Plaintiff reported having a few occasional episodes of sharp pain, no such episodes were experienced upon examination on August 31, 1999. During the examination, Plaintiff was ambulatory without a walking aid and found to have no limits; Plaintiff's Trendelenburg test was negative; and her spine was clinically straight. (Tr. 176). Similarly, the ALJ observed that Dr. Nimityongskul opined that Plaintiff was doing well on November 4, 1999, and his examination of her revealed that Plaintiff had good range of motion, and ambulated well at the clinic without problems. Plaintiff reported experiencing hip pain "off and on at times",

17

and was prescribed Vioxx as a result.  (Tr. 175).

When Plaintiff presented for examination on May 18, 2000, her mother reported that Plaintiff's hip was barely tender, "but the main problem is her lower lumbar spine.  This does not slow her down at all though and is mostly musculoskeletal in origin." (Tr. 171).  The physical examination revealed that Plaintiff had: excellent rotation, flexion and extension of her back and good forward flexion of her hips at 90 degrees, internal rotation to 20, and external rotation to 45 degrees; evidence of gentle lumbar curve of about 10 to 15 degrees and some hyperlordosis; weak rectus spine muscles; and x-rays of the spine were normal.  (Tr. 171-172).  Dr. Nimityongskul prescribed physical therapy for back exercises and abdominal strengthening and lumbar-sacral corset.  (Tr. 171, 173).  Upon his examination of Plaintiff on August 24, 2000, Dr. Nimityongskul reported that Plaintiff was doing well, had no increased pain in her hip, and her x-rays showed no active progress change or any active radiolucency in the femoral neck.  (Tr. 170).  Dr. Nimityongskul felt mature bone was slowly filing in, and recommended that Plaintiff continue to refrain from physical education class, contact sports and strenuous activities and that she return for a follow-up exam in six (6) months.  Id.

Plaintiff's Trendelenburg test was again negative upon

examination on February 22, 2001, and according to Dr. Nimityongskul, Plaintiff was able to one leg stand on either side; squat very well; had good motor strength throughout; range of motion was forward flexion to 100 degrees, 10 degrees of internal rotation and 30 degrees of external rotation on the hip; x-rays showed excellent incorporation of the fibular graft; and she had a little bit of lucency on the inferior portion of her femoral neck, and some reconstitution of her tension lines in the femoral neck. (Tr. 195). Treatment notes indicate that Plaintiff's mother reported that Plaintiff had been doing okay, had refrained from participating in any contact sports or running, did not complain of any groin pain, and had only occasionally complained of thigh tenderness. Id. Based on his examination of Plaintiff, Dr. Nimityongskul recommended yearly follow-up visits to make sure Plaintiff was doing well. Id.

Upon a follow-up examination on June 14, 2001, Plaintiff reported that she had experienced pain with activities during the prior several weeks, and Dr. Nimityongskul decided to monitor Plaintiff's condition and recommended that Plaintiff do limited activities and perform protective weight bearing. (Tr. 198). However, the ALJ observed that treatment notes dated October 8, 2001 again indicated that Plaintiff experienced only occasional pain, and had in fact been asymptomatic over the

19

prior three months.  Further, the notes reflect that Dr. Nimityongskul specifically noted that no surgery was recommended at that point.  (Tr. 197).

Moreover, like Dr. Nimityongskul, physicians at the Barial Clinic opined that Plaintiff was doing well upon examination on January 11, 2000.  (Tr. 17, 153).  To that end, the ALJ observed that since Plaintiff's alleged onset of disability, follow-up examinations repeatedly indicate that Plaintiff was doing well and only suffered from occasional pain, and that she had in fact made an excellent recovery from her surgery by the time she sought disability benefits.

Based on the above, the undersigned finds that the ALJ did not err in finding that Plaintiff does not have an impairment, or combination of impairments, that meet or medically equal a Listing or result in severity functionally equivalent to a listed impairment, and the decision is supported by substantial evidence.  As correctly observed by the ALJ, the report submitted by Plaintiff's teacher, as well as record medical evidence, undermine Plaintiff's contention that her impairments are functionally equivalent to a listed impairment.  As noted *supra*, one of Plaintiff's teachers described Plaintiff as being a typical student and reported that Plaintiff's functioning compares favorably with the functioning of other children her

age and that absenteeism was not a problems. (Tr. 112-114).
The teacher further indicated that Plaintiff: functions
academically with average ability and performs as most other
normal children; works well independently and responds
appropriately to teachers; has no problems with social skills;
has no problems with any age-appropriate self-help skills; does
not require any special devices to accommodate her physical
needs; and has not exhibited any sudden worsening in functioning
or behavior. (Tr. 17, 112-114). While Plaintiff argues that
the ALJ provided no basis for finding Plaintiff's and her
mother's testimony not credible regarding the degree of pain and
functional limitations experienced by Plaintiff, the undersigned
disagrees. Indeed, in affording little weight to the proffered
testimony, the ALJ observed:

> On numerous occasions, the claimant's treating
> physician reported that the minor child is doing well,
> and he also indicated that the claimant experiences
> only occasional pain. For example, the minor child
> experienced several weeks of pain in June 2001,
> however, the record indicates that this pain subsided.
> The treating physician reported, in October 2001, that
> the minor child experiences only occasional pain and
> that she had been basically asymptomatic for a three-
> month period of time.

(Tr. 18). As correctly observed by the ALJ, record medical
evidence reveals Plaintiff's examinations repeatedly indicate
that Plaintiff was doing well and only suffered from occasional

pain.  (Tr. 153, 170, 175, 179-184, 195).  To that end, the ALJ
opined:

> By October 2001, the treating physician reported that
> the claimant experienced only occasional pain.  He
> indicated that the minor child has been basically
> asymptomatic over the prior three months.  He
> indicated, at that time, that he did not recommend
> further surgery.  The Administrative Law Judge notes
> that this entry tends to contradict the testimony
> received into evidence at the hearing.

(Tr. 17).  Additionally, upon examination on March 5, 1998,
treatment notes indicate that Plaintiff's parents reported that
Plaintiff was not limiting her activities, and was riding a
bike, running around, and being pretty active.  (Tr. 181).  The
medical evidence, coupled with the school records, clearly
support the ALJ's finding Plaintiff's and her mother's testimony
regarding the degree of pain and functional limitations
experienced by Plaintiff was not entirely credible.

Moreover, while Plaintiff contends  that her condition
adversely affected her relationship with her friends and overall
interaction with others, the record reveals that Plaintiff's
mother reported that Plaintiff: talks with family and friends;
has friends her own age; can make friends; generally gets along
with her mother, school teachers and other adults; keeps out of
trouble; and obeys rules.  (Tr. 77, 80, 103, 105-106).
Plaintiff's mother also testified that Plaintiff was adjusting
better to her condition.  (Tr. 204).  As Plaintiff's impairments

do not meet or medically equal a Listing, and record evidence does not reflect marked impairments in at least two areas of functioning, or extreme impairment in at least one area of functioning, the undersigned finds that the ALJ did not err in concluding that Plaintiff is not disabled.   See 20 C.F.R. § 416.926a(d),(e),(f) (2005).

**V.    Conclusion**

For the reasons set forth, and upon careful consideration of the administrative record and memoranda of the parties, it is recommended that the decision of the Commissioner of Social Security denying Plaintiff's claim for supplemental security income benefits be **AFFIRMED.**

The attached sheet contains important information regarding objections to this report and recommendation.

**DONE** this **14th** day of **March, 2005**.

    **s/ SONJA F. BIVINS**
**UNITED STATES MAGISTRATE JUDGE**

23

### MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS AND RESPONSIBILITIES FOLLOWING RECOMMENDATION AND FINDINGS CONCERNING NEED FOR TRANSCRIPT

1.   **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(c); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.   **Opposing party's response to the objection.**  Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection. Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.   **Transcript (applicable where proceedings tape recorded)**.
Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the
magistrate judge finds that the tapes and original records in
this action are adequate for purposes of review.  Any party
planning to object to this recommendation, but unable to pay the
fee for a transcript, is advised that a judicial determination
that transcription is necessary is required before the United
States will pay the cost of the transcript.

                              **s / SONJA F. BIVINS**
                         **UNITED STATES MAGISTRATE JUDGE**